**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00257-CR
NO. 09-21-00258-CR
NO. 09-21-00259-CR
NO. 09-21-00260-CR
NO. 09-21-00261-CR
NO. 09-21-00262-CR

_____

**JUAN MANUEL CORONA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 18-01-00151-CR, 18-01-00713-CR, 18-01-00714-CR,**
**18-02-01458-CR, 19-11-15655-CR & 19-12-16502-CR**

**MEMORANDUM OPINION**

Appellant Juan Manuel Corona ("Corona," "Manny," or "Appellant") pleaded "not guilty" to six charges: three charges of sexual assault of a child, two charges of aggravated sexual assault of a child, and one charge of sexual performance by a child. A jury found Corona guilty of all six charges. The jury assessed punishment

1

of life imprisonment for the two convictions of aggravated sexual assault of a child; it assessed twenty years on the three convictions of sexual assault of a child; and it assessed twenty years on the conviction of sexual performance by a child. After considering the State's motion to cumulate, the trial court ordered that Corona serve his life sentence in one cause first and ordered the other sentences shall be served consecutively thereafter. Appellant timely filed his notice of appeal. Appellant raises three issues on appeal challenging the trial court's denial of his Motion to Suppress the Search Warrant and the denial of two Motions for Mistrial. We affirm.

## The Indictments

In March 2018, a grand jury indicted Corona on four charges: sexual assault of a child ("Camille"[1]) on or about January 15, 2005; aggravated sexual assault of a child younger than fourteen ("Camille") on or about November 15, 2003; sexual assault of a child ("Elizabeth") on or about September 30, 2017; and sexual performance of a child ("Camille") on or about July 1, 2004. On November 21, 2019, a grand jury indicted Corona on two additional charges: sexual assault of a child ("Elizabeth"), a child younger than fourteen, on or about July 1, 2016; and sexual

---

[1] We use pseudonyms to refer to the victims and their families. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

assault of a child ("Elizabeth") on or about September 10, 2017. The cases were tried to a jury in a single proceeding.

Evidence at Trial

Testimony of Elizabeth

Elizabeth testified that she was eighteen years old at the time of trial, she had lived in The Woodlands her whole life, and she was twelve when she started seventh grade and turned thirteen during that school year. Elizabeth recalled that in 2014 her family was introduced to Juan Corona, and Corona was her coach when she played on a softball team in the fall of 2015. Elizabeth agreed that after she started playing for the team, Corona would pick her up from home or school, and he gave her private lessons about twice a week. Elizabeth testified that her family treated Corona "as family[,]" he would buy her gifts, and she would go to mini-golf, for ice cream, or to an arcade with Corona.

Elizabeth testified that in the summer of 2016, Corona picked her up from her house and took her for a lesson. When she got into Corona's truck, she mentioned that her leg was hurting. She remembered Corona saying, "Let's stretch it, and I'll massage it out and maybe that will help it." According to Elizabeth, as she scooted over on the seat, Corona stuck his finger under her shorts and under her underwear and into her vagina, and his fingers were moving. Elizabeth testified that she told Corona to stop, he pushed her, and he would not stop. When he did finally stop,

3

Elizabeth was scared, she went to the bathroom, and Corona told her not to tell anyone because no one would listen to her, she would be the one to get in trouble, and no one would marry her. Elizabeth explained that she did not tell her mother what happened because she did not know what to say and because she felt that she was the one "in the wrong[.]" She testified that she did not tell her father because Corona was his best friend.

Elizabeth recalled another incident that happened in the fall of 2017 when she was in ninth grade. According to Elizabeth, Corona picked her up from school, and at that time her private lessons with Corona included Cross-Fit-style workouts, including an exercise where she was on her back on a mat, using a medicine ball, and twisting from side to side. Elizabeth testified that Corona would sit in front of her while she did the exercise, sometimes on his phone, and she did not know whether she was being recorded. According to Elizabeth, on one occasion, while she was in the backseat of Corona's truck to grab equipment, Corona was angry, he put his finger in her vagina, and he told her not to tell anyone. Elizabeth stated that she told him to stop, and this was the last time something happened. After this incident, Elizabeth asked her parents to take her to her lessons, but she did not tell her parents why she no longer wanted Corona picking her up.

Elizabeth also testified about a time when she and her friend Regina went with Corona to the automobile body shop where Corona worked when Corona was

4

working on Regina's mother's car, because Corona needed a part. According to Elizabeth, on the way, Corona stopped at a convenience store, where he got a Mike's Hard Lemonade and a Styrofoam cup. Elizabeth testified that Corona poured some of the drink into the cup and told Regina and her to drink it. At the time, Elizabeth and Regina agreed not to tell anyone about the incident. Elizabeth recalled that her parents had dinner with Regina's parents on January 2, 2018, and when her parents came home, they asked her "if the Mike's Hard Lemonade trip was actually true, and what had happened." Elizabeth testified that is when she also told her mother that Corona had touched her inappropriately. According to Elizabeth, her parents called the police that night, and a couple of days later, Elizabeth talked with a forensic interviewer and had a medical exam. Elizabeth agreed she told the Sexual Assault Nurse Examiner ("SANE") that she was thirteen years old when the first incident with Corona occurred. Elizabeth agreed that she did not tell the forensic interviewer or the SANE that Corona had put his finger in her anus because "it's just embarrassing to talk about." Elizabeth also agreed that, when talking with the prosecutor, she initially denied that Corona had put his finger in her anus but after she felt more comfortable talking to the prosecutor, she told her about it.

Elizabeth identified Corona, the defendant, as the person who put his finger in her sexual organ on two occasions and in her anus on one occasion. She agreed that she had a birthmark on her shin, she had multiple pairs of black and white shorts,

5

and she owned a black and green medicine ball. Elizabeth testified that she watched the video in State's Exhibit 221, and she recognized herself. She also recognized herself in images taken from the video even though her face was not visible because she recognized her birthmark, shoes, and shorts.

Testimony of Camille

Camille testified that she was born in Amarillo, and when her parents separated, she, her mother, and her siblings moved to The Woodlands and moved in with Corona in 2002, when Camille was in sixth grade. Camille recalled that Corona's home was at 32 East White Willow Circle in Montgomery County, and she lived there from the age of twelve until she was about eighteen or nineteen. According to Camille, when she was fourteen years old, her mother and siblings moved out of Corona's house, her mother gave her a choice of where to live, and Camille stayed with Corona because she was "tired of moving around so much." Camille stated that she rarely saw her mother.

Camille testified that Corona would have her rub or scratch his back in his bedroom to help him sleep almost every night. Camille recalled that when she was thirteen and about a year after she had moved into Corona's house, she fell asleep in Corona's bed, and when she woke up, "he had his fingers in [her] vagina[,]" he was moving his fingers, and her pants were off, but she had not taken her pants off herself. Camille stated that she was shocked and asked Corona what he was doing,

but she did not remember anything else about that night. Camille testified that, the next morning, Corona asked her if she was going to tell, and she told him, "no." Camille agreed that about a week or two later, Corona put his fingers in her vagina again, but she did not remember the details. According to Camille, it had "become a common thing."

According to Camille, she and Corona would go fishing, hunting, to concerts, sporting events, to the movies, and to the arcade. During this timeframe, Corona continued to put his finger into her vagina, and he also had intercourse with her. Camille recalled that the first time Corona had intercourse with her was in 2003 on a hunting trip to Hondo when she was "[a]bout 14." Camille testified that, even though other people were staying in the home, she was supposed to sleep in Corona's bedroom, and that is where he "grabbed a condom and penetrated" her with his penis. Camille explained that she felt ashamed afterwards and she did not tell any of the adults at the house because she was afraid. She also did not tell her mother after returning to The Woodlands because she was afraid of her mother and ashamed of herself. According to Camille, about a week later, Corona had intercourse with her again, and after that it happened "too many [times] to count."

Camille testified that one time, Corona had intercourse with her in the waiting area at the automobile body shop where Corona worked. Camille testified that she remembered another incident at the body shop when she was sixteen because it was

7

the first time she told Corona "no." According to Camille, the incident happened after softball practice, and she told Corona, "I don't want to do this anymore." Camille testified that Corona then got upset, he asked what she was going to do, and he told her she should go to the police station, but she would have "nowhere to go and no one to go to[.]" Camille also testified that Corona threatened to kill himself and that she would be to blame.

Camille recalled that during the summer before her senior year in high school, she decided to run away from Corona's house because she did not want to have an intimate relationship or sexual relations with him any longer and "he didn't take no for an answer[,]" and she went to a boyfriend's house, where she stayed for about two weeks, but her boyfriend's parents took her back to Corona's house. According to Camille, Corona was upset and told her, "You're going to tell that you have lied, and I'm going to have you write a paper and sign it, saying that you lied. If you don't, I'm going to drop you off on the side of the road with all your belonging[s] and [you will have] nowhere to go." Camille testified that Corona drove her to a place she thought was a bank, they went inside, and Corona had her write and sign a letter saying she lied, and someone at the bank notarized it. Camille believed this occurred on August 11, 2018, when she was eighteen years old. Camille testified that what she wrote in the notarized letter was not true, and she went along with writing the letter because she was scared. According to Camille, when they got back

8

to Corona's house, sexual relations with Corona continued even though that was not what Camille wanted. Camille testified that sometimes Corona would give her gifts in exchange for her engaging in a sexual act, and that sometimes if she did not want to have intercourse with him, he would offer her something in exchange. Camille also testified that Corona was controlling, he messaged her "at all hours" to see what she was doing, and he would not allow her to see her family often or to hang out with her friends.

Camille testified that she attended college in Washington after graduating from high school, and when she came back to Texas for Thanksgiving, she thought Corona showed anger and jealousy because she had a boyfriend in Washington and Corona continued to be controlling. Eventually, Corona told her he would not pay for her college expenses, and when she returned to Texas, Corona picked her up at the airport, he told her that she might have an STD, and that he wanted to examine her. Camille recalled that he had her take off her clothes and he looked at her vagina and he was "poking and touching things[.]" Camille testified that Corona told her that she had an infection and "the only way to clear it out was penetration[,]" so they had intercourse. According to Camille, that was the last time she had sexual contact with Corona.

Camille recalled that at one point she had looked around Corona's house for "videos and pictures that he took of [her], anything that he had of [her] sexually[]"

9

and she found mini discs in his dresser, and when she watched them, she saw that "[s]ome were wrestling videos, and some of them were sexual videos[]" involving her. Camille testified that she was angry, and she thought she destroyed them all. Camille recognized herself in certain photographs the State showed her, and she testified that Corona made the recordings or took the photos depicted in the images. Camille identified herself in one of the photos using a sex toy that Corona had purchased.

Camille testified that she found out she was pregnant when she was dating James but still living with Corona, she went to a pregnancy assistance center with James, and after talking to a counselor, the counselor wanted Camille to file a report with the police. According to Camille, in 2011, shortly after talking with the counselor, she filed a report with the police, and James went with her when she made her report. Camille testified that she also gathered up her things at Corona's house because she no longer wanted to live there and she took the "note [she] was forced to write and sign and get notarized[,]" which she found in a dresser in Corona's room. Camille explained that she took the note as "evidence[]" that she was telling the truth and forced to write the note, and she gave the note to the police. According to Camille, the officer she spoke with said someone would be following up but that no one did.

Camille testified that in 2012, her friend Kate called her, told her to turn on the news, and Camille saw something about Corona. Camille explained that she called a detective who had been trying to reach her, and when she finally connected with the detective, she gave the detective a more detailed statement than she had previously given. Camille agreed that she recognized herself in the video admitted as State's Exhibit 222. Camille identified the defendant as the person who induced her to engage in sexual conduct or performance on or about July 1, 2004, when she was under the age of eighteen; the person who penetrated her vagina with his sexual organ on or about January 15, 2005, while she was being recorded by a telephone at Corona's house; and the person who penetrated her sexual organ with his finger on or about November 14, 2003, after she fell asleep in his bed.

Testimony of Regina

Regina testified that she was fourteen years old when she made a police report in 2018. She testified that she knew Elizabeth, who was a year older than Regina, and she and Elizabeth both played on a softball team that Manny Corona and Elizabeth's father coached. Regina recalled that when she was thirteen or fourteen, Corona came to her house to work on her mother's car, Elizabeth was also at her house, and Corona asked the girls if they wanted to go with him to the shop to pick up a part. She recalled that she and Elizabeth went with Corona, and they stopped at a gas station, where Corona bought Mike's Hard Lemonade. According to Regina,

11

Corona poured the drink into a Styrofoam cup and handed it to Elizabeth, and both she and Elizabeth drank some of it. According to Regina, when Corona drove them back to Regina's house, he told the girls not to tell their parents they had been drinking.

Testimony of Charlotte

Charlotte testified that Elizabeth is her daughter, and when Elizabeth was twelve years old, she started playing with a girls' softball team that Charlotte's husband, two other fathers, and "Coach Manny" formed. Charlotte identified the defendant as Coach Manny. At one point, Elizabeth took private lessons from Corona. Charlotte recalled that Corona did body repair work on cars at a body shop in The Woodlands in addition to working as a softball coach. Charlotte testified that sometimes Corona would pick up Elizabeth and take her to private softball lessons in the summer of 2016.

Charlotte testified that in January 2018, she heard from the parents of Elizabeth's friend Regina that Regina had been served alcohol. After Charlotte and her husband Michael met with Regina's parents, Charlotte and Michael asked Elizabeth whether Corona had served her alcohol, and Elizabeth said he had. Charlotte recalled that Elizabeth was upset and said "[t]here is more. . . . I've been touched down here [] [b]y Coach Manny[,]" and Elizabeth "pointed to her lady areas[]" when saying this. According to Charlotte, Elizabeth said she had been

12

touched multiple times by Corona. Charlotte testified that she and her husband filed a police report that night, which was January 2, 2018, and that Elizabeth also gave a statement to the police that night. She recalled that Detective Acosta called her the following day to arrange an interview for Elizabeth at Children's Safe Harbor, the interview was the next day—January 4, 2018—and the SANE exam was January 5.

Testimony of Juliet

Juliet testified that she was twenty-four years old, she lived in San Antonio, and she was a softball coach. Juliet recalled that Corona was her softball coach when she was thirteen years old in 2011. Juliet referred to Corona as "Coach Manny" and she stated that Manny created a softball team she played on. Juliet identified the defendant as her former coach. Juliet explained that she became involved in this case after an investigator contacted her. Juliet testified that when she first spoke with the investigator she told the investigator Corona touched her "inappropriately[,]" outside of her clothing, and Juliet did not recall other details until later. Juliet also testified that she had been expecting for someone to reach out to her because she had seen a news article about Corona.

Juliet agreed that at one point something occurred between Corona and herself that made her feel uncomfortable. According to Juliet, Corona took her to Galveston in 2011 when she was thirteen years old, and Corona got in the water with her. Juliet testified that when she got into deeper water, Corona "picked [her] up by [her] legs

13

and kind of cradled [her] and inserted his finger inside [her] vagina." Juliet testified that she was uncomfortable, but that Corona told her "it's okay." Juliet recalled crying on the way home and being afraid to say anything to anyone. Juliet also recalled an incident that occurred at a gym. According to Juliet, while she was doing a warm-up lap, Corona took her behind the building where there were trees, he pulled down his pants, and "he had [her] put his hand on his penis and start massaging his penis." Juliet also stated that Corona kissed her. Juliet further testified that Corona took her to his house twice. According to Juliet, Corona had her lie on his bed face down, he pulled her pants down, and he "inserted his finger insider [her] vagina and anus, and he penetrated [her]."

Juliet recognized State's Exhibits 156 and 157 as photographs of her and Corona when she was about thirteen years old. When asked why she never told anyone what Corona had done, Juliet replied, "[i]t's a very embarrassing and hard thing to say, that I was brainwashed and manipulated and I wasn't my own person, and that everything that he said was what I would do. And it is just embarrassing for me to say." Juliet testified that she quit playing softball in 2012 because she "no longer felt comfortable playing for [Corona]."

Testimony of Mayra Domingue

Domingue testified that she was a multidisciplinary team coordinator and forensic interviewer at Children's Safe Harbor—an advocacy center that provides

services to families and children that have experienced trauma—and she had done this work for about thirteen years and had conducted about 3,000 interviews. Domingue described a forensic interview as "a developmentally sensitive and legally sound method of gathering factual information regarding allegations of abuse or exposure to violence in children." Domingue explained that sometimes a child's memories are fragmented, and children have a hard time putting things in chronological order. She stated that, when she is interviewing a child, she tries to get details surrounding the event to anchor it accurately in time. Domingue testified that she conducted a forensic interview with Elizabeth on January 4, 2018, after a referral by law enforcement. Domingue recalled Elizabeth smiled at first but also was nervous and emotional.

According to Domingue, children "[v]ery rarely[]" make an outcry immediately after sexual abuse has occurred because most of the time, the abuse is performed by someone close to the child whom the child trusts, because the child feels shame, because the child believes it is their fault, or because they have been threatened by the abuser. Domingue stated that, based on her experience, "it's rare that children make up allegations of abuse." She also testified that sometimes a child may recant a disclosure of abuse if the child does not have a good support system or if the child is not believed. Domingue testified that a child might "stick around with her perpetrator[]" because "[i]t's typically that is a trusted person in their life[]" or

because of fear. Domingue testified that "grooming is a set of behaviors that someone conducts for the purpose of offending at a later time[,]" and that perpetrators sometimes groom a victim's parents to gain the family's trust. Domingue agreed that grooming may include buying gifts as well as an initial touch that is nonsexual but later escalates. She also explained that perpetrators may control children emotionally or financially and try to keep the child from being in relationships with others.

Testimony of the Sexual Assault Nurse Examiner ("SANE")

A Sexual Assault Nurse Examiner employed at Memorial Hermann Hospital testified that she had been doing medical exams at Children's Safe Harbor for about five years. She explained that when the exam is more than 120 hours after a sexual assault occurred, it is unlikely that evidence such as DNA or semen can be collected. The SANE identified State's Exhibit 62 as her medical forensic record of her examination of Elizabeth. The SANE stated that the exam was on January 5, 2018, and Elizabeth was fourteen years old at the time. According to the SANE, Elizabeth's parents brought her to the exam. The SANE testified that Elizabeth gave her a history and the SANE noted every word. The SANE read the history Elizabeth provided in which Elizabeth stated that her coach, Manny Corona, did "inappropriate things" to her. On one occasion, he reached inside her underwear and put his fingers in her vagina, and on another occasion, he reached into her shorts and put his fingers

16

in her vagina and gave her and her friend Regina some Mike's Hard Lemonade. According to Elizabeth's report to the SANE, during both occurrences, she told Corona to stop. The SANE reported that Elizabeth's friend Regina told her parents about the alcohol, Regina's parents contacted Elizabeth's parents, and when Elizabeth's parents talked with her, she "told them everything[,]" including that it was "good not to keep the secret" anymore. The SANE testified that she was not able to establish a date for an assault, but that Elizabeth stated that "the first time she was 13 years old." The SANE also agreed that no evidence was collected because the exam occurred more than 120 hours after the incidents.

Testimony of Detective Adam Acosta

Detective Adam Acosta testified that he is employed by the Montgomery County Precinct 3 constable's office, where he had been assigned to the Crimes Against Children unit for about three years working on cases involving physical or sexual abuse. He had previously worked for a constable's office in Harris County and as a jailer for the Harris County Sheriff's Office. Acosta also testified that he had trained others how to investigate child sexual abuse cases. Acosta agreed that the cases he has worked on "dealt mainly with outcries that were delayed[.]" Acosta testified that, in his experience, perpetrators may shift blame onto the victim or rationalize or minimize what they did.

17

Acosta testified that he became involved in this case on January 2, 2018, when patrol officers responded to a call at the house of a victim—Elizabeth—and her parents, and that the initial report was based on what the parents told the officers. Acosta also testified that, two days later, he received phone calls from the parents of Regina—a friend of Elizabeth's—and he spoke to Elizabeth's parents. According to Acosta, the officers scheduled a forensic interview for Elizabeth with Children's Safe Harbor. Acosta agreed that, after that interview, he was investigating the case for more than one count of child sexual abuse, and Juan Manuel Corona was the suspect. Acosta testified that, after he spoke with Elizabeth's parents and consulting with the District Attorney's ("D.A.") office, he presented the D.A.'s office with a probable cause affidavit for Corona's arrest for sexual assault of a child. Acosta recalled that Corona was arrested, and Acosta interviewed Corona in a police vehicle. Acosta testified that, the following day, Regina had a forensic interview, Acosta spoke with Regina's parents, and Elizabeth had an examination with a Sexual Assault Nurse Examiner. Acosta testified that, a few days later, a woman named Juliet called the office to express concerns, and he also spoke with her. According to Acosta, Juliet was concerned about Camille, whom she used to see with Corona. Acosta also testified that he received a call from a man named George, which led Acosta to believe that there was another woman named Kate he needed to be concerned about.

18

Acosta agreed that on January 9, 2018, he received a phone call from Camille, and he went to her house the next day and interviewed her. Acosta testified that after talking with Camille and her husband James, he opened another offense report. Acosta also testified that he talked to Elizabeth's parents that day. Acosta then worked on search warrants for Corona's house and for the shop where Corona worked, and that both locations were in Montgomery County. Acosta agreed that both warrants were executed on January 12, 2018, and he took photographs at both locations. According to Acosta, he did not seize any evidence at the body shop, but he did seize items from Corona's home, including: photos of Camille; a camcorder on a tripod with thirty-four mini DVDs; a black case with CDs and DVDs; team photos for the softball team; and Corona's iPhone. He also testified that bottles of Mike's Hard Lemonade were in the refrigerator at Corona's house. Acosta testified that he received black-and-white shoes and pink-and-green shoes from Elizabeth's parents, which he recognized in certain photos from Corona's home that were admitted into evidence. Acosta also agreed that several images of Elizabeth were recovered from Corona's iPhone as well as "images of a partially unclothed female bent over in a vehicle[.]" Acosta agreed that he showed images taken from one of the mini discs found at Corona's home to Camille, and Camille recognized herself in the images. Acosta agreed that Exhibit 49 depicts a female with a "red sexual device[,]" and he testified that Camille remembered that Corona had such a device

19

that he had her use on herself. Acosta described State's Exhibit 222 as a four-to-five-minute video of "a young [] female, and she is nude, posing in various positions. And she is also taking part in sexual activities."

Acosta testified that he spoke with Kate and he showed Camille some images taken from one of the mini DVDs and a "red sexual device." According to Acosta, Camille had filed a report concerning Corona with the Montgomery County Sheriff's Office in March 2012, and Acosta obtained a copy of that report in February 2018.

Testimony of Tori Lowe

Tori Lowe testified that she is a forensic analyst and property and evidence technician with the Montgomery County Precinct 3 constable's office. She testified that she performs cell phone extractions, she was given twelve phones in this case, and she performed extractions. Lowe testified that she put "Mr. Yuk" stickers on the phones to indicate they may contain child pornography. According to Lowe, some of the phones were "older phones[]" that she was unable to get to power on, and she was only able to process two phones. Lowe explained that she uses software named Cellebrite to download from the phone and produce a report.

Defense Witnesses

The defense called three women who testified that they had played softball on a team that Corona coached, and they had never been inappropriately touched. Two men testified that they had coached softball with Corona, and they had never

20

observed any inappropriate conduct by Corona. One woman testified that her husband coached softball with Corona, and she had not seen nor heard of any inappropriate conduct. One man testified he worked with Corona at the body shop, and he had never seen any inappropriate behavior by Corona. One man testified that he had lived at Corona's house for three to four years, Camille had never expressed to him that she wanted to leave, and he never observed a "flirty relationship[]" between Corona and Camille. Corona's mother testified that she knew Camille, but that Camille had never told her she needed help. She also testified that she knew Juliet, but that Juliet had never told her she had been sexually assaulted by Corona. Corona's aunt testified that she works at a crisis hotline for a shelter that assists women who have experienced violence or sexual assault. She also testified that she knew Camille, and she had never seen Camille act like she was a victim of sexual abuse.

## Probable Cause for a Search Warrant

In his first issue, Appellant argues that the trial court erred by denying his Motion to Suppress the Search Warrant of his home in Montgomery County because the affidavit supporting the warrant was based on conclusory statements, provided no basis for probable cause, and "relied on 8-9 year old information." According to Appellant, so much time had passed between the time of the events described in the

21

affidavit as to render the affidavit stale, and Appellant contends it was not reasonable to presume that the items sought were still located in the suspected place.

At the hearing the trial court held on the motion to suppress, Appellant argued that the affidavit supporting the warrant "cannot establish probable cause because relevant portions of the affidavit were based on information that [was] stale at the time it was issued." Defense counsel challenged whether the affidavit supporting the search warrant was sufficient to establish probable cause but did not specify whether the challenge was constitutional or statutory. On appeal, Appellant's brief states that, in order to issue a search warrant, a magistrate must be provided with an affidavit sufficient to demonstrate probable cause, citing article 18.01(b) of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 18.01(b). Therefore, we construe Appellant's issue as a statutory challenge to the search warrant under the Texas exclusionary rule. *See Holder v. State*, 639 S.W.3d 704, 707 (Tex. Crim. App. 2022) (An appellant that did not invoke the Fourth Amendment on appeal could not rely on the federal exclusionary rule, and any applicable remedy was under Article 38.23.).

On a motion to suppress, we use a bifurcated standard of review. *See State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019); *State v. Martinez*, 570 S.W.3d 278, 281 (Tex. Crim. App. 2019). We give the trial court almost complete deference in its determination of historical facts, especially if it is based on an assessment of

22

demeanor and credibility, in its rulings on application of law to questions of fact and to mixed questions of law and fact if those questions depend on an evaluation of demeanor and credibility. *See Martinez*, 570 S.W.3d at 281. We review questions of law de novo. *Id.* We view the record in the light most favorable to the trial court's ruling, and we uphold the ruling if it is supported by the record and is correct under any theory of the law applicable to the case. *See Ruiz*, 577 S.W.3d at 545. When the trial court is determining probable cause to support the issuance of a search warrant, there are no credibility determinations, and the trial court is constrained to the four corners of the affidavit. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011). Therefore, when we review a magistrate's decision to issue a warrant, we apply a highly deferential standard, and we uphold a magistrate's probable cause determination if the magistrate had a substantial basis for concluding that probable cause existed. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013); *McLain*, 337 S.W.3d at 271.

A search warrant may not issue unless it is based on probable cause. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9.

> No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. A sworn affidavit setting forth substantial facts establishing probable cause shall be filed in every instance in which a search warrant is requested.

Tex. Code Crim. Proc. Ann. art. 18.01(b). Probable cause for a search warrant exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at the specified location. *See Parker v. State*, No. PD-0388-21, __S.W.3d __, 2022 Tex. Crim. App. LEXIS 470, at *8 (Tex. Crim. App. July 27, 2022) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Flores v. State*, 319 S.W.3d 697, 702 (Tex. Crim. App. 2010); *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007)). When magistrates are making a probable cause determination, "they are dealing with probabilities and not hard certainties." *Id.* Probable cause by its nature deals with probabilities and "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (citing *Woodward v. State*, 668 S.W.2d 337, 345 (Tex. Crim. App. 1984) (op. on reh'g)); *see also Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966).

Affidavits used in support of a warrant should be read "'realistically and with common sense,' and reasonable inferences may be drawn from the facts and circumstances set out within the four corners of the affidavit." *Crider v. State*, 352 S.W.3d 704, 707 (Tex. Crim. App. 2011) (quoting *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006)). The affidavit must contain sufficient facts to support a probable cause finding that the evidence is still available and in the same location. *Id.*

Corona complains about the "staleness" of facts stated in the affidavit. To determine whether the facts in an affidavit are stale, a court must examine the time that has elapsed between the events recited in the affidavit and the time the search warrant was issued, in light of the type of criminal activity involved. *See id.* "'The significance of the length of time between the point probable cause arose and when the warrant issued depends largely upon the property's nature, and should be contemplated in view of the practical considerations of every day life.'" *Id.* at 707 n.9 (quoting *United States v. Brinklow*, 560 F.2d 1003, 1005-06 (10th Cir. 1977)). Factors relevant to determining staleness include (1) the type of crime, whether a short-term incident or a long-term enterprise; (2) the suspect, whether established or "nomadic"; (3) the item to be seized, whether perishable or of "'enduring utility to its holder'"; and (4) the place to be searched, whether it was a "'forum of convenience or a secure operational base.'" *Id.* at 708 (quoting *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006)). "When the affidavit recites facts indicating activity of a protracted and continuous nature—*i.e.*, a course of conduct— the passage of time becomes less significant." *McKissick v. State*, 209 S.W.3d 205, 214 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). "'Probable cause ceases to exist when, at the time the search warrant is issued, it would be unreasonable to presume the items remain at the suspected place.'" *Manuel v. State*, 481 S.W.3d 278,

288 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting *McKissick*, 209 S.W.3d at 214).

"[C]ourts have repeatedly recognized that in child pornography cases, collectors of child pornography tend to retain this material." *Ex parte Jones*, 473 S.W.3d 850, 857 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) (citing *United States v. Ricciardelli*, 998 F.2d 8, 12 n.4 (1st Cir. 1993) (noting that "[h]istory teaches that collectors [of child pornography] prefer not to dispose of their dross, typically retaining obscene materials for years"); *United States v. Cox*, 190 F. Supp. 2d 330, 333-34 (N.D.N.Y. 2002) (rejecting staleness argument on grounds that collectors of child pornography are likely to retain such images and because the images can be recovered by forensic experts);[2] *see also Ahern v. State*, No. 03-14-

---

[2] "In the context of child-pornography cases, Texas and federal courts have repeatedly rejected claims that the passage of months or even more than a year between the alleged activity and issuance of the warrant renders the information within an affidavit stale." *Ahern v. State*, No. 03-14-00090-CR, 2016 Tex. App. LEXIS 12717, at **16-18 (Tex. App.—Austin Dec. 1, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *United States v. Lemon*, 590 F.3d 612, 615 (8th Cir. 2010) ("Many courts, including our own, have given substantial weight to testimony from qualified law enforcement agents about the extent to which pedophiles retain child pornography."); *United States v. Morales-Aldahondo*, 524 F.3d 115, 119 (1st Cir. 2008) (holding that three-year delay between acquisition of child pornography and application for warrant did not render supporting information stale since "customers of child pornography sites do not quickly dispose of their cache"); *United States v. Watzman*, 486 F.3d 1004, 1008 (7th Cir. 2007) (rejecting challenge to probable cause where three months elapsed between the crime and issuance of the warrant where agent testified child pornographers retain their collected materials for long periods of time); *United States v. Gourde*, 440 F.3d 1065, 1072 (9th Cir. 2006) (en banc) (concluding that "[t]he details provided on the

00090-CR, 2016 Tex. App. LEXIS 12717, at *16 (Tex. App.—Austin Dec. 1, 2016, pet. ref'd) (mem. op., not designated for publication). Allegations that child pornography images may be stored on a computer may indicate that the suspect is engaged in the continued possession of child pornography. *See Morris v. State*, 62 S.W.3d 817, 823-24 (Tex. App.—Waco 2001, no pet.) (citing *Burke v. State*, 27 S.W.3d 651, 655 (Tex. App.—Waco 2000, pet. ref'd)); *see also United States v. Payne*, 519 F. Supp. 2d 466, 477-78 (D.N.J. 2007) (stating that "the nature of digital evidence [] weighs against a finding of staleness[]" because computer images are difficult to permanently delete and can often be recovered by forensic experts).

The Texas exclusionary rule excludes from a criminal trial all evidence that was obtained "in violation of any provisions of the Constitution or laws of the State of Texas[.]" *See* Tex. Code Crim. Proc. Ann. art. 38.23(a). Any error in failing to suppress evidence at trial that was illegally obtained under Article I, Section 9 of the Texas Constitution "is not error of a constitutional dimension, but simply a statutory violation." *Holder*, 639 S.W.3d at 707. We analyze any such harm under Texas Rule

---

use of computers by child pornographers and the collector profile" provided support for a finding of probable cause); *United States v. Riccardi*, 405 F.3d 852, 861 (10th Cir. 2005) (finding probable cause based, in part, on "the observation that possessors often keep electronic copies of child pornography"); *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) ("We are unwilling to assume that collectors of child pornography keep their materials indefinitely, but the nature of the crime, as set forth in this affidavit, provided 'good reason[]' to believe the computerized visual depictions downloaded by Lacy would be present in his apartment when the search was conducted ten months later.")).

of Appellate Procedure 44.2(b), and we disregard any error that does not affect a defendant's substantial rights. *Id.* (citing Tex. R. App. P. 44.2(b)).

Acosta stated in his affidavit that he spoke with Camille on January 10, 2018, after Corona had been charged with sexual assault in a different investigation. The affidavit stated that Camille reported to Acosta that she had been sexually assaulted by Corona on multiple occasions, when she was between thirteen and nineteen years old. The affidavit further stated that Camille reported that Corona first penetrated her vagina with his finger when she was thirteen years old, that he first had intercourse with her in 2004 while on a trip to Hondo, that Corona forced her to write a letter denying that he was sexually abusing her, and that on at least two occasions, Corona had video-recorded himself sexually assaulting Camille. The affidavit also stated that Acosta had spoken with a counselor who told him that Camille had reported in 2012 that Corona had sexually assaulted Camille for multiple years, and the counselor had made a police report with the Montgomery County Sheriff's Office. Acosta also stated that he had spoken with Camille's husband, whom Camille had told about Corona's sexual assaults. Acosta's Affidavit for Search Warrant was signed on January 11, 2018, and the search warrant issued the same day. Only one day elapsed between Camille's report to police and the issuance of the search warrant, and the nature of the allegations, along with the description of video

28

recordings and knowledge that this kind of information is often retained by the suspected abuser, weighs against the staleness complaint.

The affidavit stated that Acosta had spoken with Camille on January 10, 2018, and that Camille had reported to Acosta that Corona had sexually abused her on multiple occasions when she was between the ages of thirteen and nineteen. The affidavit stated that Camille had reported to him that, on at least two occasions, Corona would video record himself sexually assaulting Camille when Corona lived at 32 East White Willow Circle. The affidavit also stated that Camille had spoken with Acosta "as a result of Corona being recently incarcerated and charged with sexually abusing a child in an unrelated investigation." The search warrant sought:

> Implements, instruments and or any item used in the commission of AGGRAVATED SEXUAL ASSAULT OF A CHILD, Texas Penal Code Section: 22.021.
> Photographs of the inside and outside of the residence and premises; Or any device, instruments, paraphernalia or substances utilized in the commission of the offense of Aggravated Sexual Assault of a Child, including but not limited to photographs, visual or audio recordings of the assault created by camera, video camera, cell phone, electronic tablets and any device capable of making a visual recording or audio recording or capable of receiving or sending texts and electronic images. Including external storage devices, computers, lap tops, flash devices, SD cards, or any such electronic device capable of storing electronic images, along with power cords necessary to operate the devices; and legal or illegal controlled substances or intoxicating substances that may have had an intoxicating effect on the victim.

In his affidavit, Acosta stated,

> Based on Affiant's experience investigating cases involving sexual abuse of children and Affiant's contact and discussions with

investigators who work solely on cases involving child pornography, Affiant can state that suspects with a sexual interest in children, and who obtain or receive digital images of children often retain those images on an electronic device in storage so that it can be accessed again. Affiant can state that he has a reasonable basis to believe that the suspect in this case captured the images of the child [Camille], and as a result created and possesses images of child pornography. In addition Affiant knows from prior experiences in investigating sexual assaults of children that suspects will sometimes use[] intoxicating substances that can be legally or illegally obtained to sedate their victim.

In denying Corona's motion to suppress, the trial court stated:

Even though it was nine years later, there is enough in here to indicate that defendants sometimes keep videos.
. . .
The other thing that is compelling to me is . . . my understanding that both of these were signed at the same time. . . .
. . .
So due to those reasons and the totality of the circumstances and reading everything in the warrant -- you know, there is a paragraph that is compelling to me that says many times based on affiant's experience involving sexual abuse of children and the contact and discussion with other investigators who work solely on these types of cases involving child pornography -- the fact that it is not just a sexual assault, that it is also he is looking for child pornography, kind of tipped it for me for purposes of the record.

Applying a highly deferential standard and deferring to the reasonable inferences the magistrate could have made based on the four corners of the affidavit, we conclude the magistrate had a substantial basis for concluding there was probable cause to support the search. "Probable cause exists when, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found at the specified location." *McLain*, 337 S.W.3d at 272.

30

Based on the totality of circumstances, the allegations established a fair probability that Corona had at his home or at the body shop items used in the commission of aggravated sexual assault of a child, including possible photographs, recordings, or electronic images. *See Bonds*, 403 S.W.3d at 873; *McLain*, 337 S.W.3d at 271; *Jones*, 473 S.W.3d at 857. Also, based on the nature and duration of the alleged crime as well as the nature of the items sought relative to the suspected crimes, we conclude that the facts in the affidavit supporting the search warrant were not so stale as to preclude probable cause. *See Crider*, 352 S.W.3d at 707. Therefore, we find the trial court did not abuse its discretion in denying the motion to suppress. *See State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014).

That said, even if the trial court had erred in denying Corona's motion to suppress, such error would be non-constitutional and subject to a harmless-error analysis under Rule 44.2(b). *See* Tex. R. App. P. 44.2(b); *Holder*, 639 S.W.3d at 707. Under this standard, we uphold the conviction unless we determine that the error affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). Appellant's brief does not identify any way his substantial rights were affected as to any of the crimes for which he was charged and convicted.

Corona was tried on three counts of sexual assault of a child, two counts of aggravated sexual assault of a child, and one count of sexual performance by a child. A child's testimony alone is sufficient to support a conviction for sexual assault of a

31

child or aggravated sexual assault of a child when the child is under the age of seventeen at the time of the alleged offense. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. [Panel Op.] 1978); *Jeansonne v. State*, 624 S.W.3d 78, 92 (Tex. App.—Houston [1st Dist.] 2021, no pet.). Therefore, the jury need not have considered any evidence obtained from execution of the search warrant of Corona's home to have convicted him on the charges for sexual assault of a child and aggravated sexual assault of a child.

Corona was also charged under section 43.25(b) of the Penal Code, which provides that a person commits the offense of sexual performance of a child "if, knowing the character and content thereof, he employs, authorizes, or induces a child younger than 18 years of age to engage in sexual conduct or a sexual performance." *See* Tex. Penal Code Ann. § 43.25(b). The statute defines "sexual conduct" as "sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola." *Id.* § 43.25(a)(2). The statute defines "sexual performance" as "any performance or part thereof that includes sexual conduct by a child younger than 18 years of age[,]" and defines "performance" as "any play, motion picture, photograph, dance, or other visual representation that can be exhibited before an audience of one or more persons." *Id.* § 43.25(a)(1), (3). Therefore, the jury could have found Corona guilty

of sexual performance of a child for either sexual conduct *or* sexual performance. *See id.* § 43.25(b). Camille testified that she was about fifteen years old when Corona asked her to pose without clothes and that he would ask her to stimulate him or herself for him to record, and he would use his cell phone to record himself having intercourse with her. The jury, as factfinder, could have believed Camille's testimony and found Corona guilty of sexual performance of a child even without the admission of the still images or video recordings. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Edward v. State*, 635 S.W3d 649, 655 (Tex. Crim. App. 2021); *DuBose v. State*, 977 S.W.2d 877, 882 (Tex. App.—Beaumont 1998, no pet.).

We overrule Appellant's first issue.

Motions for Mistrial

Appellant's second and third issues argue that the trial court erred in denying his motions for mistrial. We review a trial court's denial of a motion for mistrial for an abuse of discretion, viewing the evidence in the light most favorable to the trial court's ruling and considering only those arguments before the trial court at the time of the ruling. *See Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We must uphold the ruling if it was within the zone of reasonable disagreement. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). We reverse the ruling only if the trial court's decision was clearly erroneous and arbitrary. *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012).

The erroneous admission of evidence is non-constitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Non-constitutional errors are harmful and require reversal only if they affect an appellant's substantial rights. *Id.* An error is reversible only when it has a substantial and injurious effect or influence on the jury's verdict. *Id.* If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction. *Id.* In making this determination, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained of error. *Id.*

A mistrial is the appropriate remedy when the objected-to evidence or events during trial are so inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the defendant. *Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004). A mistrial is required only in extreme circumstances when the prejudice is incurable because it "is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). Because a mistrial is an extreme remedy, "a mistrial should be granted 'only when residual

prejudice remains' after less drastic alternatives are explored." *Ocon*, 284 S.W.3d at 884-85 (quoting *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005)).

An instruction to disregard may cure an improper reference or impression unless the objectionable evidence is so clearly calculated to inflame the minds of the jury or is of such damaging character as to suggest it would be impossible to remove the harmful impression from the mind of the jury. *See Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) (en banc). On appeal, we generally presume the jury followed the trial court's instruction as given. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). To rebut this presumption, an appellant must point to evidence that the jury failed to follow the trial court's instruction. *Id.*; *Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

Motion for Mistrial Based on Admitted Evidence and Testimony

In his second issue, Appellant argues that the trial court abused its discretion in denying his motion for a mistrial based on testimony about the Cellebrite[3] report. The trial court initially admitted a Cellebrite report on a cell phone seized from Corona during the investigation. Corona objected to its admission and argued he had not been given an opportunity to review the report, the State told the court its discovery log reflected that defense counsel had reviewed the report, and the trial

---

[3] The State's witness testified that she used a computer program called "Cellebrite" to extract information from Corona's cell phone.

court instructed Corona to find an expert to review the report. The following day, the trial court then decided not to admit the report into evidence, and Corona asked for a mistrial because the jury had heard there was "possible child porn" on the phone and that metadata would place the photos at the softball field. The trial court denied the motion for mistrial. Defense counsel requested an instruction to disregard, and the trial court initially said it would "wait on that[]" pending the State determining whether discovery was actually sent to the defense. Later the same day, the defense renewed its motion for mistrial and requested an instruction to disregard, and the trial court stated, "I will instruct the jury to disregard anything about a forensic download." The following day, after additional argument by counsel, the trial court instructed the jury, "I am going to go ahead and just admonish the jury at this time that you are not to consider [] any testimony concerning the Cellebrite report, the testimony of the latitude and the longitude, or any testimony concerning the forensic download."

Corona has not pointed to any evidence showing that the jury failed to follow the trial court's instruction, and he has failed to rebut the presumption that the jury followed the court's instruction to disregard. *See Thrift*, 176 S.W.3d at 224. Moreover, considering other unobjected-to testimony and evidence, the trial court could have determined that the witness's testimony about the Cellebrite report and "child porn" were not clearly calculated to inflame the minds of the jury or so

36

damaging as to be impossible to cure any harmful impression. *See Kemp*, 846 S.W.2d at 308. Nothing in our record indicates the State emphasized the testimony about the Cellebrite report, the metadata, or the initial admission of the report into evidence. *See Gonzalez*, 544 S.W.3d at 373. After examining the record as a whole, we conclude such error, if any, was harmless, was addressed by the instruction to disregard, and did not influence the jury. *See id.* Viewing the evidence in the light most favorable to the trial court's ruling, we conclude the trial court did not abuse its discretion in denying Corona's motion for mistrial based on the Cellebrite report, and we overrule Appellant's second issue. *See Ocon*, 284 S.W.3d at 884.

Motion for Mistrial Based on Recess

In his third issue, Appellant argues that the trial court abused its discretion in denying his motion for mistrial and in recessing the trial for over a month. Appellant argues that the trial court "prioritized judicial efficiency over the Appellant's right to a fair and impartial trial."

On July 19, 2021, the fifth day of trial, the trial court stated that Corona was not present, and Corona's attorney had informed the court that Corona was "having some health issues and [was] in the hospital." The court told the parties that it had told the jury that the trial had been delayed and that they should check in later in the day to see if there was more information. The prosecutor requested medical testimony about the necessity of hospital treatment, and the court agreed that "[w]e

just need it in writing[]" and stated, "if he is in the hospital and is not going to be released, [] I am not going to have the jury wait around for a week hoping that he will be out." The State told the court it would not ask for a mistrial because the trial had been ongoing for more than a week and the State was almost ready to rest its case. The court noted that both parties had already invested a lot of time in the case, had cross-examined witnesses, and presented "a ton of evidence[.]"

The following day, the trial court told the parties that it was the court's understanding that the defendant was still in the hospital and "we don't know when he is going to be released[.]" The court also stated that "we are at a crucial point in this trial [and] my proposal is to reset this case." The court gave two dates and proposed to have the jury vote on which was the better date. The court also stated that, upon reconvening, the parties would have time for a "mini opening statement [] to trigger [the jury's] memory to let them know what is going on." The court stated that it believed that the defendant was not trying to "get out of anything[,]" wanted his day in court, and that his health was a concern. The court also stated that due to the pandemic, there was a backlog of defendants in custody who were waiting for trial and that Corona was out on bond. Defense counsel asked for an opportunity to confer with her client, after which defense counsel told the court:

> I was able to talk to my client. He was tired and groggy and it was difficult to talk to him. But he said that he doesn't really know what to do. He said to ask for a mistrial. He said he is feeling so bad at this point he doesn't think that he can make a decision based on that.

The court denied the motion for a mistrial. Before asking the jury to choose between the two available dates, the court told the jury "I just decided that I didn't think a mistrial was appropriate just due to the fact that I feel like we have invested so much." The jury chose the earlier date, which was about four weeks later. When the trial resumed on August 16, 2021, the State and the defendant gave a short summary (about five minutes) of the evidence offered to that point.

The Sixth Amendment to the Constitution guarantees an accused in a criminal prosecution the right to be confronted with the witnesses against him, which includes the accused's right to be present in the courtroom during his trial. *Garcia v. State*, 149 S.W.3d 135, 140 (Tex. Crim. App. 2004). The Due Process Clause of the Fifth Amendment gives a criminal defendant a "'valued right to have his trial completed by a particular tribunal[,]'" but this right "'must in some circumstances be subordinated to the public's interest in fair trials designed to end in just judgments.'" *Ex parte Garza*, 337 S.W.3d 903, 909 (Tex. Crim. App. 2011) (quoting *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). "[A] trial court must remain solicitous of the defendant's valued right to proceed to verdict with the tribunal originally selected, and does not do so—indeed, abuses its discretion—when it grants a mistrial without first entertaining every reasonable alternative." *Id*. at 916. "The need for a continuance does not, by itself, justify a mistrial[.]" *Id.* "The discretion to discharge the jury before it has reached a verdict is to be exercised only in very extraordinary

39

and striking circumstances[.]" *See Downum v. United States*, 372 U.S. 734, 736 (1963) (cleaned up).

Appellant argues that manifest necessity required a mistrial. A trial court's decision to declare a mistrial is limited to determining if there was a "manifest necessity" to grant a mistrial. *See Pierson v. State*, 426 S.W.3d 763, 770 (Tex. Crim. App. 2014). Manifest necessity for a mistrial exists "when the circumstances render it impossible to arrive at a fair verdict, when it is impossible to continue with trial, or when the verdict would be automatically reversed on appeal because of trial error." *Hill v. State*, 90 S.W.3d 308, 313 (Tex. Crim. App. 2002). To determine whether manifest necessity exists, a court should take "all the circumstances into consideration[]" and decide the issue in light of the arguments that were before the court when it ruled. *See United States v. Perez*, 22 U.S. 579, 580 (1824); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). A trial court must consider and rule out less drastic alternatives before granting a mistrial. *See Hill*, 90 S.W.3d at 313. As an appellate court, our function is to review the record and determine if the trial judge exercised "sound discretion" when granting or denying a mistrial. *Arizona v. Washington*, 434 U.S. 497, 514 (1978). We uphold a trial court's ruling if it was within the zone of reasonable disagreement. *Coble*, 330 S.W.3d at 292; *Wead*, 129 S.W.3d at 129.

Here, after the defendant did not appear at trial, and after the defense attorney notified the court that the defendant was in the hospital, the trial court briefly adjourned the case overnight and obtained more information. When the case resumed the next day, the defense attorney told the court that Corona was still in the hospital, that she had spoken to him, but he was "tired and groggy" when he was in the hospital, that he was not sure what to do, and that he instructed her to ask for a mistrial. Corona did not argue that the circumstances would make it impossible for a jury to arrive at a fair verdict, that it was impossible to continue with trial, or that the verdict would be automatically reversed on appeal if there were no mistrial. *See Hill*, 90 S.W.3d at 313. When defense counsel requested a mistrial, the trial court listed competing factors including the time already invested by parties, witnesses, jurors, and the court; the backlog of cases created by the pandemic; and the fact that Corona was out on bail and other defendants were in custody and waiting for trial. Appellant's brief does not allege there were any difficulties continuing trial after the recess or that the recess prejudiced the jury or prevented Corona from presenting witnesses or evidence, and he makes only a conclusory argument that "[t]he circumstances of this trial rendered it impossible to arrive at a fair verdict and rendered it impossible to continue trial."

Appellant's brief suggests that "[t]he facts of this case were far more egregious than the *Rodriguez* case[]" in which the trial court declared a mistrial

41

because during trial, it became apparent that the prosecution had been aware of certain evidence for months, but had failed to disclose the evidence until a week before trial despite a discovery order. *See Ex parte Rodriguez*, 366 S.W.3d 291, 294 (Tex. App.—Amarillo 2012, pet. ref'd). The trial court in *Rodriquez* granted a mistrial *sua sponte* because the defense would need to hire an expert and the court "couldn't keep a jury on the hook that long." *Id.* On review, the Amarillo Court of Appeals considered the options available to the trial court, including continuing the proceedings, excluding the evidence that had not been disclosed, and declaring a mistrial. *Id.* at 298. The court concluded the trial court had authority to declare a mistrial and had the obligation to meaningfully consider the manifest necessity of doing so. *Id*. at 298-99.

We conclude that *Rodriguez* is factually distinguishable. Here, the trial court denied the motion for mistrial and the record shows the trial court explored and adopted an alternative to a mistrial, and there was no recently disclosed evidence or experts, or need for a protracted delay. We find *Ex parte Garza* more instructive. *See generally Garza*, 337 S.W.3d 903. In *Garza*, the defendant was tried for a misdemeanor offense, and before the trial started, one of the jurors became ill. *Id.* at 905. The trial was continued for a few days, but the trial court ultimately declared a mistrial, explaining that "when the trial takes considerably longer than what the Court had anticipated, that could create problems with the jury's attitude and the

42

jury's willingness to process information and so forth[.]" *Id.* at 907. On review, the Court of Criminal Appeals concluded that there is no manifest necessity for a mistrial due to a juror's illness "without at least exploring the option to wait a week, possibly then to conduct the trial with only five jurors." *Id.* at 911.

In this case, consistent with the admonition in *Garza*, the trial court explained to the jury that Corona was in the hospital and asked them to consider two dates for continuing the trial, and the jury selected the earlier date. *See id.* The trial court also considered the fact that the parties had already "invested so much[]" at that point. Corona's trial took place during July and August of 2021, when the Supreme Court had emergency orders in place regarding the COVID-19 pandemic,[4] and the trial court specifically noted the pandemic's effect on trial schedules and stated, "you have to be a little more fluid, especially during these times."

The trial court correctly considered and implemented a less drastic alternative when faced with a motion for mistrial, and the trial court's decision to recess the trial until the defendant could return and to allow the jury's involvement in selecting a date to continue the trial was a less drastic alternative. *See id.*; *Hill*, 90 S.W.3d at 313. Considering all the circumstances before the trial court at the time of the motion for mistrial, we conclude the trial court did not abuse its discretion in denying the

---

[4] *See In re Fortieth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 911 (Tex. 2021); *In re Thirty-Ninth Emergency Order Regarding the COVID-19 State of Disaster*, 629 S.W.3d 213 (Tex. 2021).

motion for mistrial. *See Perez*, 22 U.S. at 580; *Garcia*, 149 S.W.3d at 140; *Wead*, 129 S.W.3d at 129. We overrule Appellant's third issue.

Having overruled all of Appellant's issues, we affirm the trial court's judgments.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 7, 2022
Opinion Delivered October 26, 2022
Do Not Publish

Before Golemon, C.J., Horton & Johnson, JJ.

44